# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 9:24-cv-80332

MANE VENTURES, LLC, a California limited
liability company; DIANA THOMAS, an
individual; and AMELIA THOMAS, an
individual,

                Plaintiffs,

    vs.

EQUESTRIAN INTERNATIONAL LLC, a
Florida limited liability company; 2166325
ONTARIO INC. DBA EQUESTRIAN
INTERNATIONAL, a Canadian corporation;
and BEATA ZBIEROWSKA, an individual,

                Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Mane Ventures, LLC ("Mane Ventures"), Diana Thomas ("D. Thomas"), and Amelia Thomas ("A. Thomas") (collectively referred to as "Plaintiffs"), by and through their undersigned counsel, sue Defendants Equestrian International, LLC ("Equestrian International"), 2166325 Ontario Inc. dba Equestrian International ("2166325 Ontario"), and Beata Zbierowska ("Zbierowska") (collectively referred to as "Defendants") and allege as follows:

## INTRODUCTION

1.    This lawsuit arises from the breach of a May 11, 2023 Purchase Agreement (the "Purchase Agreement") for the purchase of a horse named Quebec Z, having United States Equestrian Federation ("USEF") Number 5854262 ("Quebec Z" or the "Horse").

2.    Defendants, and each of them, held themselves out as a full service horse-scouting agency for the importation of hunter, jumper, and equitation sport horses from Europe to the United States.

3.       Defendants, and each of them, are the *alter egos* of one another, that is, defendants Zbierowska, Equestrian International, and 2166325 Ontario are all one and the same. Zbierowska is the managing member of Equestrian International and the President and only director of 2166325 Ontario. Zbierowska dominated and controlled both Equestrian International and 2166325 Ontario to such extent that Equestrian International and 2166325 Ontario each had no independent existence; thus, the corporate veil should be pierced and Zbierowska should be held personally liable for 2166325 Ontario's obligations to Plaintiffs under the terms of the Purchase Agreement and the corporate veil should be reverse pierced and Equestrian International should be held personally liable for Zbierowska's obligations to Plaintiffs.

4.       Based on Defendants' extensive experience scouting horses in Europe, Plaintiffs originally contacted Zbierowska looking to purchase a sport horse from Europe with the intention of importing the horse from Europe to the United States, training the horse, competing with the horse at show jumping competitions in the United States, and selling the horse to someone looking to compete in the "big equitation" classes.[1]

5.       Zbierowska introduced Plaintiffs to "Quebec Z" and made representations that the Horse was safe, sound, healthy, and free from defects, and capable of performing in the hunter and/or equitation show rings. Those representations were false.

6.       Zbierowska made material misrepresentations to the Plaintiffs about the quality and health of "Quebec Z," knowing that Plaintiffs would rely on these representations in choosing to move forward with a Pre Purchase Exam ("PPE") of the Horse.

---

[1] "Big equitation" and "hunter" classes referenced herein specifically refer to jumping classes where the fence height is 3'3"-3'9"; such classes require horses to jump said height over a technical track where said jumps are generously decorated with fill and other materials making them wide and solid.

7.     Notwithstanding the aforementioned material misrepresentations made by Zbierowska to Plaintiffs as to the quality of the horse for whom Plaintiffs thought they were having a PPE performed, that is, having a PPE performed on a horse capable of competing in the "big equitation" and "hunter" classes as represented by Zbierowska, the actual Quebec Z was not of the same quality as the horse that was presented to the Plaintiff for purposes of having a PPE performed, vetted, and subsequently sold to Plaintiffs.

8.     Defendants have engaged in a fraudulent and duplicitous conduct related to the sale of Quebec Z, including, but not limited to: (1) shipping a horse to Plaintiffs that is a different horse than the horse Plaintiffs advertised and represented to Plaintiffs to be for sale, and a different horse than the horse that the Plaintiffs contracted to buy; (2) sending a horse of inferior quality and value, that is, and at all times was, a horse that was incapable of competing in the "big equitation" classes, and far from the quality of the horse Defendants represented to Plaintiffs as was for sale, to Plaintiffs, and a different horse from the horse Plaintiffs entered into the Purchase Agreement to purchase; and (3) sending a horse to the Plaintiffs that is so unsound that it is unable to perform any "sport horse" job let alone able to compete in the "big equitation" or "hunter" classes.

9.     This lawsuit seeks to recoup the damages incurred by Plaintiffs and hold Defendants accountable for their false statements, breach of contract, and broken promises.

## PARTIES

10.     Mane Ventures is a California limited liability company with its principal place of business in California. Mane Ventures buys and sells sport horses.

11.     D. Thomas is an individual domiciled in California and is a managing member of Mane Ventures.

12.     A. Thomas is an individual domiciled in California and is a managing member of Mane Ventures.

3

13.     On information and belief, Plaintiffs allege that Equestrian International is a Florida limited liability company with its principal place of business in Wellington, Florida, specifically with an address of 15632 Italian Cypress Way, Wellington, Florida, 33414. Equestrian International holds itself out as a horse-scouting agency for jumpers, hunters, and equitation horses from Europe. Equestrian International conducts business internationally and throughout the United States, including within the United States District Court for the Southern District of Florida.

14.     On information and belief, Plaintiffs allege that 2166325 Ontario is a Canadian corporation with its principal place of business in Mississauga, Ontario, Canada. 2166325 Ontario does business under the name "Equestrian International," and holds itself out as a horse-scouting agency for jumpers, hunters, and equitation horses from Europe. Defendant 2166325 Ontario conducted business internationally and throughout the United States, including within the United States District Court for the Southern District of Florida.

15.     On information and belief, Plaintiffs allege that Zbierowska is an individual domiciled in Wellington, Florida. Zbierowska promotes herself as an experienced horseperson. Zbierowska is exceedingly intimate with the sport horse market in both the United States and Europe and an expert in buying and selling horses; according to publicly available information, including USEF show records and social media, Zbierowska has been involved in the equestrian industry for many years, selling many horses.

16.     On information and belief, Plaintiffs allege that Zbierowska is the sole member and authorized representative of Equestrian International. Zbierowska is also the registered agent for service of process for Equestrian International. As such, Zbierowska was acting at all times material to the allegations in this Complaint as an agent and representative of Equestrian International.

17.     On information and belief, Plaintiffs allege that Zbierowska is the sole shareholder of 2166325 Ontario. Zbierowska was acting at all times material to the allegations in the Complaint as an agent and representative of 2166325 Ontario.

## ALTER EGO ALLEGATIONS

**Defendant Equestrian International Is the Alter Ego of Defendant Zbierowska**

18.     Upon information and belief, Plaintiffs allege that at all times mentioned herein, Zbierowska and her company Equestrian International were the alter egos of one another and that Equestrian International was the mere conduit and instrumentality for the personal and business affairs of Zbierowska by reason of the following:

a.     Zbierowska dominated, influenced, and controlled Equestrian International, as well as the business, property, and affairs of Equestrian International;

b.     There existed and now exists a unity of interest and ownership between Zbierowska and Equestrian International, to wit: Zbierowska is the sole member of Equestrian International, and Equestrian International and Zbierowska share the same address, and such other facts that demonstrate that the individuality and separateness of Zbierowska and Equestrian International has ceased;

c.     Equestrian International has been used as a conduit for the conduct and commingling of Zbierowska's personal business, property and affairs with its own, and that Equestrian International has used and commingled Zbierowska's income and assets for its own benefit;

d.     Equestrian International was created and continued pursuant to a fraudulent plan, scheme, and device conceived and operated by Zbierowska whereby Zbierowska's loan proceeds, income, and assets were intermingled with the assets, income, revenue and profits of

Equestrian International and the income and assets of Equestrian International were diverted and commingled with those of Zbierowska;

e.      Equestrian International was organized by Zbierowska for the purpose of shielding Zbierowska's individual, personal assets from her creditors;

f.      Zbierowska lacks the financial capacity to satisfy the amounts due and owing to Plaintiffs; and

g.      Zbierowska and Equestrian International have had united interests and operations and their separate personalities do not exist such that it would inequitable to regard their acts as those of any person or entity alone.

19.      Accordingly, Zbierowska and Equestrian International are the *alter* egos of one another other, such that Zbierowska and Equestrian International are liable for the obligations of the other with regard to Plaintiffs. Upon information and belief, Plaintiffs allege that whenever Zbierowska would receive funds, she would pool those funds and use them to pay the debts of Equestrian International. Similarly, when Equestrian International would receive funds, Equestrian International would use those funds to pay the debts of Zbierowska. In other words, Zbierowska used the assets of Equestrian International as her own and Equestrian International used the assets of Zbierowska and the other Defendants as its own. As a result, neither Zbierowska nor Equestrian International respected the corporate form of Equestrian International.

20.      Upon information and belief, Plaintiffs allege that all actions taken by Zbierowska were not acts of Zbierowska alone, but instead, were acts of Equestrian International. By virtue of the foregoing, adherence to the fiction of the separate corporate existence of Equestrian International would, under the circumstances, sanction a fraud and promote injustice in that Plaintiffs would be unable to realize upon any judgment in their favor.

21.     Here, Zbierowska also acted as Equestrian International's agent as it relates to receiving proceeds from the Purchase Agreement. Zbierowska asserted to the Plaintiffs that she was authorized to, and did in fact, act on Equestrian International's behalf as it relates to Zbierowska's interactions, promises, and agreements with Plaintiffs.

22.     Upon information and belief, Plaintiffs allege that at all times mentioned herein, Zbierowska and Equestrian International acted for each other in connection with the conduct hereinafter alleged, and that each of them performed the acts complained of herein or breached the duties herein complained of as agents of each other and each is therefore fully liable for the acts of the other.

23.     In the alternative, upon information and belief, Plaintiffs allege that Equestrian International was a third-party beneficiary of the Purchase Agreement Plaintiffs entered into with Zbierowska as Equestrian International received funds from the Purchase Agreement.

**Defendant 2166325 Ontario Is the Alter Ego of Defendant Zbierowska**

24.     Upon information and belief, Plaintiffs allege that at all times mentioned herein, Zbierowska and her company, 2166325 Ontario, were at all relevant times the alter egos of one another and that 2166325 Ontario was the mere conduit and instrumentality for the personal and business affairs of Zbierowska by reason of the following:

    a.      Zbierowska dominated, influenced, and controlled 2166325 Ontario, as well as the business, property, and affairs of 2166325 Ontario;

    b.      There existed and now exists a unity of interest and ownership between Zbierowska and 2166325 Ontario, to wit: Zbierowska is the sole shareholder of 2166325 Ontario, and 2166325 Ontario and Zbierowska share the same address, and such other facts that demonstrate that the individuality and separateness of Zbierowska and 2166325 Ontario has ceased;

c.    2166325 Ontario has been used as a conduit for the conduct and commingling of Zbierowska's personal business, property and affairs with its own, and that 2166325 Ontario has used and commingled Zbierowska's income and assets for its own benefit;

d.    2166325 Ontario was created and continued pursuant to a fraudulent plan, scheme, and device conceived and operated by Zbierowska whereby Zbierowska's loan proceeds, income, and assets were intermingled with the assets, income, revenue and profits of 2166325 Ontario and the income and assets of 2166325 Ontario were diverted and commingled with those of Zbierowska;

e.    2166325 Ontario was organized by Zbierowska for the purpose of shielding Zbierowska individual, personal assets from her creditors;

h.    Zbierowska lacks the financial capacity to satisfy the amounts due and owing to Plaintiffs; and

i.    Zbierowska and 2166325 Ontario have had united interests and operations and their separate personalities do not exist such that it would inequitable to regard their acts as those of any person or entity alone.

25.    Accordingly, Zbierowska and 2166325 Ontario are the *alter* egos of one another other, such that Zbierowska and 2166325 Ontario are liable for the obligations of the other with regard to Plaintiffs. Upon information and belief, Plaintiffs allege that whenever Zbierowska would receive funds, she would pool those funds and use them to pay the debts of 2166325 Ontario. Similarly, when 2166325 Ontario would receive funds, 2166325 Ontario would use those funds to pay the debts of Zbierowska. In other words, Zbierowska used the assets of 2166325 Ontario as her own and 2166325 Ontario used the assets of Zbierowska and the other Defendants as its own.

As a result, neither Zbierowska nor 2166325 Ontario respected the corporate form of 2166325 Ontario.

26.     Upon information and belief, Plaintiffs allege that all actions taken by Zbierowska were not acts of Zbierowska alone, but instead, were acts of 2166325 Ontario. By virtue of the foregoing, adherence to the fiction of the separate corporate existence of 2166325 Ontario would, under the circumstances, sanction a fraud and promote injustice in that Plaintiffs would be unable to realize upon any judgment in their favor.

27.     Here, Zbierowska also acted as 2166325 Ontario's agent as it relates to receiving proceeds from the Purchase Agreement. Zbierowska asserted to the Plaintiffs that she was authorized to, and did in fact, act on 2166325 Ontario's behalf as it relates to Zbierowska's interactions, promises, and agreements with Plaintiffs.

28.     Upon information and belief, Plaintiffs allege that at all times mentioned herein, Zbierowska and 2166325 Ontario acted for each other in connection with the conduct hereinafter alleged, and that each of them performed the acts complained of herein or breached the duties herein complained of as agents of each other and each is therefore fully liable for the acts of the other.

29.     In the alternative, upon information and belief, Plaintiffs allege that 2166325 Ontario was a third-party beneficiary of the Purchase Agreement Plaintiffs entered into with Zbierowska as 2166325 Ontario received funds from the Purchase Agreement.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a), in that this is a civil action between citizens of California and citizens of Florida, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Zbierowska, a citizen and resident of the State of Florida, is the sole member and/or shareholder of both

Equestrian International and 2166325 Ontario. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

31.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (3) because Zbierowska is domiciled in this district and negotiated with Plaintiffs for the sale and purchase of Quebec Z while in this district. Venue is also proper in this district because Defendants are engaging in business in this district.

## **FACTS**

32.     In early 2023, Plaintiffs, through their agent Valerie Downing ("Plaintiffs' Agent"), contacted Zbierowska, looking for a "hunter" or "equitation" type horse in Europe priced in the mid-five figures (approximately $50,000), expressly for the purpose of importing it from Europe and reselling it in the United States.

33.     In response to this request, Zbierowska, the owner and manager of Equestrian International and 2166325 Ontario, sent Plaintiffs' Agent information regarding several appropriate horses, including a horse Zbierowska represented to the Plaintiffs and the Plaintiffs' Agent named "Quebec Z," a nine year old, 17 hand, sport horse located in the Netherlands at Johnson Horses in the possession of Desiree Johnson and Theodore Boris.

34.     During this introduction to the Horse, Zbierowska sent Plaintiffs' Agent a document titled "Pre-Purchase Exam Request Form for Referring Veterinarians" printed on Equestrian International's letterhead.

35.     The aforementioned document purports to detail the standards that veterinarians must follow when conducting a PPE on every horse Zbierowska represents for sale in her business.

36.     During these initial communications, Zbierowska represented to Plaintiffs' Agent that Zbierowska always requires veterinarians to adhere to the parameters detailed in Equestrian

International's "Pre-Purchase Exam Request Form for Referring Veterinarians" for all PPEs conducted on horses Zbierowska represents for sale.

37.     On or about April 27, 2023, Plaintiffs' Agent inquired of Zbierowska as to whether the horse Zbierowska represented and advertised as "Quebec Z" was still available and asked for more photographs and videos. Zbierowska sent a video of the horse she represented to be "Quebec Z" in which Plaintiffs' Agent could clearly verify the skill of the horse and the quality of his jump and suitability for "big equitation" and "hunter jumper" class competitions.

38.     The videos of the horse Zbierowska represented to be "Quebec Z" showed a horse with significant scope, was representative of a horse having the qualities of a "big equitation" horse, and the presence to perform well on the "hunter jumper" circuit in the United States.

39.     Based on what Plaintiffs' Agent saw in the video, Plaintiffs' Agent followed up with Zbierowska two days later, asking for additional information and more videos of "Quebec Z." In response, Zbierowska forwarded additional photographs of the horse that she represented to be "Quebec Z," and indicated that she was waiting for more videos from Johnson Horses.

40.     On or about May 1, 2023, Zbierowska sent another video of the horse Zbierowska represented to be "Quebec Z" jumping at a horse show with an amateur rider to the Plaintiff's Agent. Zbierowska represented to Plaintiffs' Agent that "Quebec Z" was being ridden by an amateur rider, had jumped up to 1.30 meters with the amateur rider, and was brave enough to jump the open water.

41.     At this time, Plaintiffs agreed to move forward with a PPE based on the representations of Defendants regarding the capabilities of "Quebec Z" and the standards set forth in the "Pre-Purchase Exam Request Form for Referring Veterinarians" written and disseminated by Zbierowska.

42.     On or about May 3, 2023, Dr. Charlotte Seifert conducted an X-ray and clinical exam on a horse identified to be "Quebec Z" in the written report, at Johnson Horses while "Quebec Z" was under the care of and supervision of Desiree Johnson and Theodore Boris. Attached hereto as **<u>Exhibit 1</u>** is a true and correct copy of the May 3, 2023 X-ray and Clinical Examination Report by Dr. Charlotte Seifert.

43.     Specifically, according to Dr. Seifert's PPE Report, the left hind and right hind stifle distension in the MFT joint were within normal limits with no lesions. Further, the X-ray section represented that the X-rays taken were both "good" and "acceptable." Dr. Seifert's PPE Report concluded as follows: "No swelling in legs and no sensitivity in muscle palpation."

44.     On or about May 5, 2023, at the request of Plaintiffs' Agent, Dr. Jillian Mills of Presidio Equine, an ambulatory equine veterinary practice specializing in sport horse medicine located in San Diego, California, reviewed "Quebec Z's" X-rays and requested additional diagnostics and X-rays.

45.     In response, Dr. Seifert reaffirmed that the horse Zbierowska represented to be "Quebec Z" was being vetted following the parameters detailed in the "Pre-Purchase Exam Request Form for Referring Veterinarians" and sent the requested additional X-rays to Plaintiffs' Agent.

46.     Based on the results of the PPE conducted by Dr. Seifert and the additional x-rays, Plaintiffs decided to move forward with the purchase of the horse Zbierowska represented to be "Quebec Z."

47.     On or about May 11, 2023, Zbierowska and Plaintiffs' Agent negotiated the purchase price for the horse Zbierowska represented to be "Quebec Z."

48.     On or about May 12, 2023, the Plaintiffs, Plaintiffs' Agent, and Zbierowska, as 2166325 Ontario, executed a Purchase Agreement for the purchase of the horse Zbierowska represented to be "Quebec Z." According to the Purchase Agreement, Zbierowska was the authorized agent for Theodore Boris and Desiree Johnson. Attached hereto as **<u>Exhibit 2</u>** is a true and correct copy of the May 11, 2023 Purchase Agreement.

49.     On or about May 3, 2023, Zbierowska sent videos of the horse Zbierowska represented to be "Quebec Z" prior to shipping him to the airport to fly to the United States.

50.     On or about May 19, 2023, upon information and belief, Theodore Boris and Desiree Johnson shipped the actual horse named Quebec Z from Johnson Horses to the airport for a flight to Los Angeles International Airport ("LAX"). On or about May 20, 2023, the actual Quebec Z arrived at LAX and began the quarantine process. Three days later, on or about May 23, 2023, Quebec Z was picked up and transported to Plaintiffs' Agent's horse farm in Rancho Santa Fe, California. Importantly, the hauler picking up Quebec Z at LAX noted that the Horse's hind legs were very swollen upon pick up.

51.     When Quebec Z arrived in Rancho Santa Fe, California, it was quickly apparent that the horse sold and delivered to the Plaintiffs was not, in fact, the horse that Zbierowska had sent photographs of and was not the horse Zbierowska represented to the Plaintiffs to be "Quebec Z." The horse that arrived, the actual Quebec Z, had different markings and coloring and was of significantly subpar quality than the horse Plaintiffs' Agent and Plaintiffs were led to believe they were purchasing based on the numerous photographs and video shared by Zbierowska with the Plaintiffs and the Plaintiff's Agent. Importantly, the horse that arrived at Plaintiffs' Agent's farm was not capable of competing in the "big equitation" classes, nor was the horse suitable for resale

as a 3'6" equitation horse as Plaintiffs were seeking, and as Zbierowska represented to the Plaintiffs and to the Plaintiffs' Agent as the horse that the Plaintiffs were to be purchasing.

52.    The photographs sent by Zbierowska to Plaintiffs and the Plaintiffs' Agent of the horse that Zbierowska represented to be "Quebec Z" show a dark bay horse with no markings, as is evident in the photographs below:






53.     The actual Quebec Z, the horse that arrived at LAX and the horse that was picked up by Plaintiffs, looked completely different from the horse Zbierowska represented to be "Quebec Z," with the actual Quebec Z having a pronounced star on his forehead and a lighter bay coloring, as is evidenced in the photographs below:



54.     Simply put, the horse that was delivered to the Plaintiffs was not the horse Zbierowska represented him to be and was not the horse Plaintiffs contracted with Zbierowska as 2166325 Ontario to purchase.

55.     This deception was painfully obvious during Plaintiffs' Agent's first ride when Quebec Z significantly over-jumped the jump he was asked to jump.[2] Shortly thereafter, Plaintiffs' Agent took Quebec Z to a horse show where it became evident that the horse was unfit to show and was barely capable of jumping rounds in a division a full foot lower in height than the "big equitation" classes for which Quebec Z was purchased to compete.

56.     After the horse show, Plaintiffs' Agent notified Dr. Anne McCabe, a large animal veterinarian in San Diego, of Quebec Z's poor performance, swollen limbs, and his tendency to trip or take a misstep. Plaintiffs' Agent asked Dr. McCabe to test Quebec Z for potential neurological issues.

57.     On or about June 21, 2023, Plaintiffs' Agent notified Zbierowska of Quebec Z's inability to perform the job he was purchased to perform. Specifically, Plaintiffs' Agent sent Zbierowska a text message asking whether Dr. Seifert had pulled any blood from Quebec Z during the PPE such that the blood could be tested for potential issues. In response, Zbierowska said she would check with Dr. Seifert but that she was sure Dr. Seifert had taken blood for the import and that she believed Dr. Seifert also had taken blood for toxicology testing, both of which should be stored. At this time, Zbierowska asked if everything was okay. In response, Plaintiffs' Agent informed Zbierowska that the Plaintiffs were having an Equine Protozoal Myeloencephalitis ("EPM") test performed on Quebec Z. Plaintiffs' Agent then asked if Zbierowska had time to discuss the issues with Quebec Z's performance and ability. Plaintiffs' Agent then had a telephone call with Zbierowska regarding Quebec Z's medical issues and suspected neurological issues. At

---

[2] Over-jumping can be a sign of poling, rapping or barring, which typically is used to encourage a horse to jump higher and more tightly with its front end. It is prohibited as a schooling technique on show grounds by the Fédération Equestre Internationale and, in the United States, by the USEF.

this time, Zbierowska sent Plaintiffs' Agent a video of the horse they represented to be "Quebec Z" purportedly before he boarded the plane to fly to the United States.

58.     On or about June 23, 2023, Dr. McCabe evaluated Quebec Z for soundness issues and a potential neurological issue due to his dramatically poor performance at the horse show and Quebec Z's tendency to stand in a concerning "V-Shape." Dr. McCabe was also asked to investigate an explanation for the multiple instances in which Quebec Z tripped and fell to his knees.[3] During this examination, Quebec Z flexed lame in the left hind leg and was sore in his hocks, that is, the joint in Quebec Z's hind legs. Dr. McCabe noted that both of Quebec Z's hocks were large, thickened, very sore to the  touch and that his hind legs were difficult to flex while both cold and after warming up, and that the front suspensory ligaments were also sore during her examination. Dr. McCabe noted that Quebec Z was lame in the left hind leg and was unable to turn properly when being handled from the ground, and then exhibited the same problems turning under saddle with irregular movement of his legs. Dr. McCabe suspected a neurological issue.

59.     On or about June 30, 2023, Dr. McCabe reviewed the images from the PPE, and evaluated Quebec Z again, determining that Quebec Z's back was sore, unyielding to rear limb flexions, while his medial hock/suspensory origin was firm and enlarged/sore during her examination. Quebec Z's neck was mildly reactive to palpation. The lameness exam revealed 2/5 lameness on the left leg high on the suspensory ligament. Such chronic suspensory desmitis is believed to have predated Quebec Z's purchase and will continue to interfere with his performance as a sport horse. Attached hereto as **Exhibit 3** is a true and correct copy of the compilation of Quebec Z's medical records from Dr. Anne McCabe.

---

[3] Due to safety concerns related to his tripping and soundness issues, Quebec Z is no longer being ridden and has been turned out to pasture to rest.

60.     On or about June 30, 2023, the Plaintiffs' Agent had a phone call with Zbierowska and shared information about Quebec Z's soundness issues as well as the ultrasound images with Zbierowska. Over the next two months, Zbierowska indicated that she was upset by Quebec Z's condition and represented to Plaintiffs' Agent and Plaintiffs that she would assist in seeking a remedy. Further, Zbierowska claimed to be seeking representation of a lawyer to help Plaintiffs' and Plaintiffs' Agent resolve the issues related to Quebec Z.

61.     In August 2023, Zbierowska was still representing to the Plaintiffs and the Plaintiff's Agent that she was looking for a lawyer to assist Plaintiffs in seeking recourse from the events surrounding Quebec Z's purchase. Even as recently as September 17, 2023, Zbierowska represented that she was looking for a lawyer. Zbierowska has failed to secure representation to assist Plaintiffs.

62.     Quebec Z has been unsound since he arrived from Europe. Since his arrival, Plaintiffs have engaged in multiple multifaceted veterinarian interventions. Despite Plaintiffs' extensive efforts to resolve the lameness and related issues, Quebec Z is not suitable to perform in the "big equitation" classes for which he was purchased.

63.     Upon information and belief, Plaintiffs alleges that Quebec Z's chronic conditions are painful to the horse, will worsen with age, and often lead to debilitating lameness. According to Dr. McCabe, Quebec Z has been suffering from chronic suspensory desmitis causing lameness in both rear legs. It is Dr. McCabe's professional opinion that Quebec Z was suffering from chronic suspensory desmitis prior to purchase and is unable to perform the physical requirements of a "big equitation" sport horse, the purpose for which the horse was represented by Zbierowska to be capable of and he was purchased. Further, Quebec Z is not a viable sales prospect for even low

level jumping as he will require constant maintenance treatments and medical attention to resume any sort of training over fences.

64.     Plaintiffs were seeking a horse that was sound, healthy, and free from defect at a premium price for a horse capable of performing in the "hunter" and/or "equitation" show rings. Zbierowska made the representations to Plaintiffs that Quebec Z was safe, sound, healthy, and free from defect, and capable of performing in the hunter and/or equitation show rings. At the time Zbierowska made these representations, she knew them to be false. Zbierowska represented to Plaintiffs they were purchasing a horse capable and suitable to compete in the 3'6" "equitation" or "hunters," but caused to be delivered to the Plaintiffs a horse incapable of performing in the "hunter" and/or "equitation" show rings, or quite possibly in any show at any level. Despite Zbierowska's representations, or misrepresentations, Quebec Z is not suitable for use in the "hunter" and/or "equitation" show rings and has consistently exhibited extreme lameness since import.

65.     Zbierowska made the representations that Quebec Z was safe, sound, healthy and free from defect, at a premium price, a horse capable of performing in the hunter and/or equitation show rings, knowing that Plaintiffs would rely on these representations in moving forward with a PPE. But the quality of the horse on which Plaintiffs thought they were performing a PPE, one capable of competing in the "big equitation" and "hunter" classes, as represented by the Defendants, was not the same quality as the horse that ended up being vetted and subsequently sold to Plaintiffs. Further, Zbierowska was responsible for hiring a veterinarian to perform a PPE. Surprisingly, and suspiciously, this PPE did not reveal any medical or soundness issues with Quebec Z.

66.     Based on the medical examinations and extensive testing done by ABJ Equine Practice ("ABJ Equine"), there is absolutely no question that Quebec Z is not suitable for his intended purpose and not the horse Plaintiffs bargained for. There is no question that Quebec Z is not capable of performing as a "big equitation" horse or even suitable to compete in any jumping classes at all.

67.     Plaintiffs have incurred significant damages as a result of Defendants' breach of contract, misrepresentations, and fraudulent conduct, including, but not limited to:

    a.     $87,500.00 – Purchase Price of Quebec Z;

    b.     $8,750.00 – Commission to Plaintiffs' Agent;

    c.     $12,500.00 – Transportation from the Netherlands to LAX and quarantine at LAX;

    d.     $550.00 –Transportation from LAX to Rancho Santa Fe, California;

    e.     $170.00 – USEF/USHJA registration fees;

    f.     $4,898.00 – Total cost to compete with Quebec Z at the Temecula Valley Horse Show in Temecula, California;

    g.     $13,000.00 – Training for June 2023, July 2023, August 2023, September 2023, October 2023, November 2023, December 2023, January 2024, and February 2024;

    h.     $3,535.00 – Insurance (prorated for May 2023, June 2023, July 2023, August 2023, September 2023, October 2023, November 2023, December 2023, January 2024, and February 2024);

      i.      $8,770.00 – Board for June 2023, July 2023, August 2023, September 2023, October 2023, November 2023, December 2023, January 2024, and February 2024;

      j.      $135.00 – Veterinarian review of X-rays;

      k.      $1,980.00 – Veterinarian care post arrival;

      l.      $1,275 – Farrier costs including shoeing and hoof trims;

      m.      $ 430 – Pasture boarding; and

      n.      TBD – attorneys' fees.

68.     As of the filing of this complaint, without including attorneys' fees incurred by Plaintiffs, Plaintiffs have been damaged in an amount of no less than $143,493.00.

69.     Plaintiffs' damages continue to increase each day Plaintiffs maintain possession of Quebec Z.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

70.     Plaintiffs incorporate paragraphs 1 through 69 of this Complaint as though fully set forth herein.

71.     On May 11, 2023, Plaintiffs entered into a valid, enforceable, and binding written Purchase Agreement with Defendants for the purchase of Quebec Z for the sum of $87,500.00. See **Exhibit 2**.

72.     Plaintiffs did all, or substantially all, of the things that the Purchase Agreement required of them, or were excused from performing.

73.     Defendants were not excused from performing under the terms of the Purchase Agreement for any reason.

74.     Defendants failed to perform on the contract, as they instead shipped the actual horse named Quebec Z, but when Quebec Z arrived in Rancho Santa Fe, California, it was quickly apparent that the horse named Quebec Z was not in fact that horse that Zbierowska had sent photographs of, nor the horse that Defendants represented to be "Quebec Z."

75.     The horse that arrived, the actual Quebec Z, had different markings and was of significantly subpar quality than the horse Plaintiffs and Plaintiffs' Agent were led to believe they were purchasing based on the numerous photographs shared by Defendants. Importantly, the horse that arrived at Plaintiffs' Agent's farm was not capable of competing in the "big equitation" classes, nor was the horse suitable for resale as a 3'6" equitation horse as Plaintiffs had sought, and as Defendants represented the horse that Plaintiffs were purchasing to be.

76.     As a result, Defendants have breached the Purchase Agreement.

77.     Plaintiffs did all they were required to do under the contract, or were excused from performing.

78.     As a consequential result, Plaintiffs have incurred significant damages as a direct and inevitable result of Defendants' breach.

### SECOND CAUSE OF ACTION
### (Fraudulent Misrepresentation)

79.     Plaintiffs incorporate paragraphs 1 through 69 of this Complaint as though fully set forth herein.

80.     Prior to entering into the Purchase Agreement, Plaintiffs had multiple conversations with Zbierowska about the type of horse and talent level needed of the horse that Plaintiffs intended to buy. Also, Defendants sent Plaintiffs and Plaintiffs' Agent multiple photographs and videos of the horse Defendants represented to be "Quebec Z."

81.     Defendants represented, through multiple discussions, videos, and photographs, that the horse named "Quebec Z" had significant scope, the quality to be a "big equitation" horse, and the presence to perform well on the hunter jumper circuit in the United States.

82.     Plaintiffs are informed and believe and on that basis allege that Defendants represented the above referenced facts as true to Plaintiff when they knew, or should have known, they were false.

83.     Plaintiffs are informed and believe and on that basis allege that the representations made by Defendants were fraudulent misrepresentations designed to lure Plaintiffs into entering into the Purchase Agreement with Defendants so that Defendants could make a quick profit, all for their own financial benefit.

84.     Plaintiffs reasonably, justifiably and detrimentally relied on the representations made by Defendants as enumerated above because Defendants held themselves out as professionals in scouting horses from Europe with access to a top quality horse, and conveyed the information in a believable and reliable manner as previously described herein.

85.     However, when Defendants shipped the actual horse named Quebec Z and he arrived in Rancho Santa Fe, California, it was quickly apparent that the horse named Quebec Z was not in fact that horse that Zbierowska had sent photographs of nor the horse Defendants represented to be "Quebec Z."

86.     The horse that was delivered to the Plaintiffs, the actual Quebec Z, had different markings and was of significantly subpar quality than the horse Plaintiffs and Plaintiffs' Agent were led to believe they were purchasing based on the numerous photographs shared by Defendants. Importantly, the horse that arrived at Plaintiffs' Agent's farm was not capable of competing in the "big equitation" classes, nor was the horse suitable for resale as a 3'6" equitation

horse as Plaintiffs had sought, and as Defendants represented the horse that Plaintiffs were purchasing to be.

87.     Defendants engaged in a number of fraudulent acts including, but not limited to: (1) representing to Plaintiffs in photographs and video a horse for purchase of a certain quality suitable to perform in the "big equitation" classes; (2) sending a different horse that is inferior in quality and value and incapable of performing in the "big equitation" classes; and (3) sending a horse that is of such low quality and ability he is physically unable to do any sport horse job. Because of Defendants' fraudulent conduct, Plaintiffs now have a horse that is not capable of doing the tasks for which it was purchased.

88.     As a result of Defendants' fraudulent misrepresentations, Plaintiffs financially suffered in an amount to be proven at trial.

89.     In deciding to enter into the Purchase Agreement with Defendants, Plaintiffs accepted as true the totality of the representations made by Defendants.

90.     Had Plaintiffs known that the representations made by Defendants were inaccurate, false and misleading; Plaintiffs would not have entered into business with Defendants.

## THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

91.     Plaintiffs incorporate paragraphs 1 through 69 of this Complaint as though fully set forth herein.

92.     On or about April 27, 2023 and May 1, 2023, and on other dates, Defendants, by and through Zbierowska, represented in writing to Plaintiffs that the horse named Quebec Z had significant scope, the quality to be a "big equitation" horse, was medically fit to compete, and possessed the presence to perform well on the hunter jumper circuit in the United States.

93.     Plaintiffs are informed and believe and on that basis allege that the aforesaid representations were in fact false, and that the true facts were that Defendants (1) sent Plaintiffs a different horse that is inferior in quality and value incapable of performing in the big equitation classes; (2) sent Plaintiffs a horse that was not medically fit to compete; and (3) sent a horse that is of such low quality and ability he is physically unable to do any sport horse job. Because of Defendants' fraudulent conduct, Plaintiffs now have a horse that is not capable of doing the tasks for which it was purchased.

94.     Plaintiffs are informed and believe and on that basis allege that Defendants, at the time they made these representations, had no reasonable grounds for believing them to be true in that Defendants knew or reasonably should have known that they had sent an inferior horse.

95.     Plaintiffs, at the time these representations were made and at the time Plaintiffs took the actions herein alleged, was ignorant of the falsity of Defendants' representations and believed them to be true. In reasonable and justifiable reliance on these representations, Plaintiffs entered into the Purchase Agreement.

96.     Had Plaintiffs known the true facts, they would not have agreed to purchase Quebec Z. Plaintiffs' reliance on Defendants' representations was justified because Defendants represented, via communications, videos, and photographs, that they had a horse for sale of a certain quality suitable to perform in the big equitation classes.

97.     As a direct and proximate result of the acts and conduct of Defendants, Plaintiffs have been damaged in an amount not less than $143,493.00, plus interest and attorneys' fees, the total amount of which will be proven at trial.

### FOURTH CAUSE OF ACTION
#### (Breach of the Covenant of Good Faith and Fair Dealing)

98.    Plaintiffs incorporate paragraphs 1 through 69 of this Complaint as though fully set forth herein.

99.    Under California law, the law that the parties to the Purchase Agreement agreed would govern this transaction (see **Exhibit 2**, at Section H), every contract includes an implied covenant of good faith and fair dealing in order to protect the parties' reasonable expectations. Good faith means honesty in the conduct of contractual relations. The covenant of good faith and fair dealing is implicated whenever a given question is not answered in the contract terms, or when one party has the power to use its discretion without defined standards.

100.    A contract existed between Plaintiffs and Defendants to purchase Quebec Z.

101.    Plaintiffs did all or substantially all they were required to do under the contract, or they were excused from having to do these things.

102.    All conditions required for Defendants' performance have occurred or have been waived by the conduct of the parties.

103.    Defendants failed to conduct themselves with good faith by (1) representing to Plaintiffs in photographs and video a horse for purchase of a certain quality suitable to perform in the big equitation classes; (2) sending a different horse that is inferior in quality and value and incapable of performing in the "big equitation" classes; and (3) sending a horse that is of such low quality and ability he is physically unable to do any sport horse job. Because of Defendants' fraudulent conduct, Plaintiffs now have a horse that is not capable of doing the job for which it was purchased.

104.    Plaintiffs reasonably expected Defendants to conduct themselves with good faith, including, but not limited to (1) sending the horse Defendants had represented to Plaintiffs to be

in the videos and photographs; (2) sending a horse with significant scope; (3) sending a horse with the quality to be a big equitation horse; (4) sending a horse that was medically fit to compete; and finally (5) sending a horse that had the presence to perform well on the hunter jumper circuit in the United States.

105.    Regardless of whether Defendants' actions constituted a breach of the contract, they nonetheless failed to act in good faith, specifically by failing to act with honesty in the conduct of contractual relations.

106.    Defendants' actions as pleaded herein unfairly interfered with Plaintiffs' receipt of the contract's benefits.

107.    Defendants' conduct did not comport with Plaintiffs' reasonable contractual expectations.

108.    Plaintiffs have been damages as alleged herein.

**FIFTH CAUSE OF ACTION**
**(Breach of the Express Warranty)**

109.    Plaintiffs incorporate paragraphs 1 through 69 of this Complaint as though fully set forth herein.

110.    On May 11, 2023, Plaintiffs entered into a valid, enforceable, and binding written Purchase Agreement with Defendants for the purchase of Quebec Z for the sum of $87,500.00. See **Exhibit 2**.

111.    Pursuant to Section D of the Purchase Agreement, Defendants gave the following express warranty to Plaintiffs: "The Buyer has inspected and/or ridden the horse and approves of its condition, temperament and ability as a hunter/jumper suitable for Buyer's intended purposes/uses."

112.    The express warranty made by Defendants was an essential part of the Purchase Agreement between Plaintiffs and Defendants and Plaintiffs relied on the express warranty in entering into the Purchase Agreement for Quebec Z.

113.    Defendants entered into the Purchase Agreement with Plaintiffs despite the fact that the horse was not the horse that Zbierowska represented him to be and was not the horse Plaintiffs contracted with Zbierowska as 2166325 Ontario to purchase. At the time the Purchase Agreement was executed, Quebec Z was not the horse that Defendants represented him to be. Therefore, Plaintiffs did not "inspect[] .... the horse and approve[] of its condition, temperament and ability as a hunter/jumper suitable for [Plaintiffs'] intended purposes/uses."

114.    Defendants breached the express warranty in the Purchase Agreement by providing untrue, incorrect, misleading, and inaccurate information to Plaintiffs and promising that Quebec Z was safe, sound, healthy, and free from defects, and capable of performing in the hunter and/or equitation show rings. Instead, Zbierowska misrepresented the quality and health of Quebec Z.

115.    Defendants have refused to pay the damages caused by their breach of the express warranty.

116.    As a direct and proximate result of Defendants' breach of the express warranty under the Purchase Agreement, Plaintiffs have been damaged in an amount not less than $143,493.00, plus interest and attorneys' fees, the total amount of which will be proven at trial.

## SIXTH CAUSE OF ACTION
### (Breach of Implied Warranty of Fitness for a Particular Purpose - California Commercial Code, § 2315)

117.    Plaintiffs incorporate paragraphs 1 through 69 of this Complaint as though fully set forth herein.

118.    On May 11, 2023, Plaintiffs entered into a valid, enforceable, and binding written Purchase Agreement with Defendants for the purchase of Quebec Z for the sum of $87,500.00. See **Exhibit 2**.

119.    Defendants, at the time of contracting, had reason to know the particular purpose for which Quebec Z was required based on multiple conversations with Zbierowska, and the Plaintiffs were relying on Defendants to furnish a suitable horse for such purpose.

120.    Defendants entered into the Purchase Agreement with Plaintiffs despite the fact that Quebec Z was not capable of competing in the "big equitation" classes, nor was he suitable for resale as a 3'6" equitation horse as Plaintiffs had sought, and as Zbierowska represented the horse that Plaintiffs were purchasing to be, and therefore not fit for the intended purpose.

121.    Defendants breached the implied warranty of fitness for a particular purpose contained in the Purchase Agreement by furnishing to Plaintiffs a horse which is not now and never was capable of competing in the "big equitation" classes, nor was the horse suitable for resale as a 3'6" equitation horse as Plaintiffs had sought, and as Zbierowska represented the horse that Plaintiffs were purchasing to be.

122.    Defendants were well aware of the purpose of Quebec Z at the time of negotiations, and Defendants were aware of the purpose of Quebec Z at the time they entered into the Purchase Agreement.

123.    As a direct and proximate result of Defendants' breach of the implied warranty of fitness for a particular purpose, Plaintiffs have been damaged in an amount not less than $143,493.00, plus interest and attorneys' fees, the total amount of which will be proven at trial.

## SEVENTH CAUSE OF ACTION
### (Breach of Implied Warranty of Merchantability - California Commercial Code, § 2314)

124.    Plaintiffs incorporate paragraphs 1 through 69 of this Complaint as though fully set forth herein.

125.     Defendants are "merchants" within the meaning of the California Commercial Code as they deal in the sale of horses and hold themselves out as having skill and knowledge peculiar to the sales of horses.

126.     Pursuant to Section 2104 of the California *Commercial Code*, "'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."

127.     On May 11, 2023, Plaintiffs entered into a valid, enforceable, and binding written Purchase Agreement with Defendants for the purchase of Quebec Z for the sum of $87,500.00. See **Exhibit 2**.

128.     Quebec Z is not now and never was capable of competing in the big equitation classes, nor was he suitable for resale as a 3'6" equitation horse as Plaintiffs had sought, and as Zbierowska represented the horse that Plaintiffs were purchasing to be as was negotiated by the Parties and detailed in the Purchase Agreement.

129.     Defendants entered into the Purchase Agreement with Plaintiffs despite the fact that Quebec Z is not now and never was capable of competing in the "big equitation" classes, nor was he suitable for resale as a 3'6" equitation horse as Plaintiffs had sought, and as Zbierowska represented the horse that Plaintiffs were purchasing to be, and therefore not "merchantable," according to the California *Commercial Code*.

130.     Defendants breached the implied warranty of merchantability contained in the Purchase Agreement by furnishing to Plaintiffs a horse which is not now and never was capable of competing in the "big equitation" classes, nor was he suitable for resale as a 3'6" equitation horse as Plaintiffs had sought, and as Zbierowska represented the horse that Plaintiffs were purchasing to be, and therefore not "merchantable," according to the California *Commercial Code*. Defendants were well aware of the purpose of Quebec Z at the time of negotiations, and

Defendants were aware of the purpose of Quebec Z at the time they entered into the Purchase Agreement.

131.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount not less than $143,493.00, plus interest and attorneys' fees, the total amount of which will be proven at trial.

**EIGHTH CAUSE OF ACTION**
**(Rescission)**

132.     Plaintiffs incorporate paragraphs 1 through 69 of this Complaint as though fully set forth herein.

133.     On May 11, 2023, Plaintiffs entered into a valid, enforceable, and binding written Purchase Agreement with Defendants for the purchase of Quebec Z for the sum of $87,500.00. See **Exhibit 2**.

134.     Defendants, at the time of contracting, had reason to know the particular purpose for which Quebec Z was required, and the Plaintiffs were relying on Defendants to furnish a suitable horse for such purpose. Plaintiffs and Defendants had discussions regarding the particular purpose for which the horse was being purchased.

135.     There has been a material failure in the consideration received by Plaintiffs, specifically, that Quebec Z is not now and never was capable of competing in the "big equitation" classes, nor was the horse suitable for resale as a 3'6" equitation horse as Plaintiffs had sought, and as Zbierowska represented the horse that Plaintiffs were purchasing to be.

136.     As a result of Defendants' actions, Plaintiffs have been deprived of the benefits of their bargain and were forced to pay the purchase price for Quebec Z, a horse that is not now and never was capable of competing in the "big equitation" classes, nor was he suitable for resale as a 3'6" equitation horse as Plaintiffs had sought, and as Zbierowska represented the horse that Plaintiffs were purchasing to be, in addition to other expenses, including care for Quebec Z, insurance for Quebec Z, horse show competition costs for Quebec Z, and medical care for Quebec Z.

137.     Service of the summons and complaint in this action constitutes notice of rescission of the contract between Plaintiffs and Defendants, as well as an offer to restore benefits received, as provided in California *Civil Code*, section 1691.

## NINTH CAUSE OF ACTION
### (Violation of the California Unfair Competition Law ("UCL") - Cal. Bus. & Prof. Code, §§ 17200 *et seq.*)

138.     Plaintiffs incorporate paragraphs 1 through 69 of this Complaint as though fully set forth herein.

139.     California *Business & Professions Code*, section 17200 defines unfair competition to include "unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising … ."

140.     California *Business & Professions Code*, section 17203 provides that "[t]he court may make such orders or judgments as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of unfair competition."

141.     Defendants' actions as detailed above constitute unlawful, unfair, and fraudulent business practices in violation of the UCL, that is, California *Business & Professions Code*, section 17200 et seq.

142.     Defendants, and each of them, have committed acts in violation of California *Business & Professions Code* section 17200 by, among other things, violating California *Commercial Code*, sections 2314 and 2315.

143.     As a direct and proximate result of Defendants' actions as detailed above, Defendants have been and will continue to be unjustly enriched in an amount to be proven at trial.

144.     Accordingly, pursuant to California *Business & Professions Code*, sections 17200 and 17203, Plaintiffs request the issuance of an order of this Court enjoining Defendants' continued violations.  Plaintiffs also seek an order for restitution, disgorgement, and all other relief allowed under the UCL, including interest and attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant them the relief requested as follows:

       a.     An award of compensatory damages in an amount to be determined according to proof at trial, but no less than $143,493.00 as of the date of filing this complaint and increasing each day thereafter;

       b.     An award of general damages, plus interest, according to proof at trial;

       c.     An award of restitution and disgorgement of all profits in an amount sufficient to force Defendants to disgorge all ill-gotten gains;

       d.     For pre-judgment interest at the legal rate from and after the date due according to proof;

       e.     For post-judgment interest at the legal rate from the date of judgment until payment is collected;

       f.     An award of punitive damages pursuant to California *Civil Code*, section 3294, in an amount to be determined at trial, as to all causes of action permitted by law, that is sufficient to deter Defendants from engaging in similar and continued illegal and/or wrongful conduct;

       g.     An award of reasonable attorneys' fees and costs;

       h.     All other such and further relief as the Court deems just and proper.

## **JURY DEMAND**

      Plaintiffs demand a trial by jury in this action.


DATED:  March 19, 2024            Respectfully submitted,


                               BUCHALTER,
                               A Professional Corporation


                           By:      */s/ John C. Clough*
                               JOHN C. CLOUGH
                               Florida Bar No.: 184391
                               DANIELLE M. MAYER*
                               1000 Wilshire Blvd, Suite 1500
                               Los Angeles, CA 90017
                               Telephone: 213.891.0700
                               Email:  jclough@buchalter.com
                               Email:  dmayer@buchalter.com

                               *\* PRO HAC VICE PENDING*

                               *Attorneys for Plaintiffs Mare Ventures, LLC,*
                               *Diana Thomas, and Amelia Thomas*

# EXHIBIT 1

**DIERENARTS CHARLOTTE SEIFERT**
Olmenlei 53, 2980 Zoersel, BELGIUM
T +32 (0)498 46 00 51

**X-ray and Clinical Examination**

Executed for:

DESIREE JOHNSEN

| | |
|---|---|
| Executed on: | 03/05/2023 |
| Name: | QUEBEC Z |
| Chip Number: | 528210004035313 |
| UELN Number: | 056015Z55565414 |
| Origin: | QUIDAM DE REVEL x CHIN CHIN |
| Sex: | M |
| Birthdate: | 10/04/2014 |
| Colour: | |

A clinical and X-Ray examination was performed.

**Clinical Examination:**

| | |
|---|---|
| Conformation and stand: | normal |
| Nutritional Status: | normal |
| Skin and coat: | normal |
| Mucous membranes: | normal |
| Lymph Nodes: | normal |
| Eyes: | normal |
| Mouth: | normal |
| Cardiovascular System | |
| Heart rate at rest: | normal |
| Heart rate after exercise: | normal |
| Jugular vene: | normal |
| Respiratory System | |
| Respiration at rest: | normal |
| Respiration after exercise: | normal |
| Spontaneous coughing: | normal |
| Larynx sensitivity: | normal |
| Type of respiration: | normal |
| Digestive System: | normal |
| Urogenital System: | normal |
| Nervous System: | normal |
| Inspection and Palpation | |
| Head: | normal |
| Neck: | normal |
| Withers: | normal |
| Back: | normal |
| Croup: | normal |
| Left front limb: | normal |
| Right front limb: | normal |
| Left hind limb: | normal |
| Right hind limb: | normal |
| Fore and Hind Hooves | |
| Horn quality: | normal |
| Hoof percussion: | normal |
| Size and shape: | normal |
| Fore and Hind Shoeing: | normal |
| Scars: | normal |

**Gait:**

Walking on hard surface

This report is only valid if provided with a signature and general terms and conditions.



**DIERENARTS CHARLOTTE SEIFERT**
Olmenlei 53, 2980 Zoersel, BELGIUM
T +32 (0)498 46 00 51

| | |
|---|---|
| Straight line: | normal |
| Small circle left: | normal |
| Small circle right: | normal |
| Trotting on hard surface | |
| Straight line: | normal |
| Small circle left: | normal |
| Small circle right: | normal |
| Trotting on soft surface | |
| Small circle left: | normal |
| Small circle right: | normal |
| Cantering on soft surface | |
| Small circle left: | normal |
| Small circle right: | normal |
| | |
| Walking backwards: | normal |

**Flexion Tests:**

| Forced Flexion | | Trotting Away | |
|---|---|---|---|
| LF: | not sensitive | LF: | not lame |
| RF: | not sensitive | RF: | not lame |
| LH: | not sensitive | LH: | little less push first steps |
| RH: | not sensitive | RH: | not lame |

**Spavin Tests:**

| Forced Flexion | | Trotting Away | |
|---|---|---|---|
| LH: | not sensitive | LH: | not lame |
| RH: | not sensitive | RH: | not lame |
| Inspection of stifle: | | | normal |

This report is only valid if provided with a signature and general terms and conditions.

**EMAIL:** seifertcharlotte@hotmail.com



**DIERENARTS CHARLOTTE SEIFERT**
Olmenlei 53, 2980 Zoersel, BELGIUM
T +32 (0)498 46 00 51

---

**X-Ray Examination**

| | |
|---|---|
| Navicular DP RF: | Class 1 |
| Navicular DP LF: | Class 1 |
| Navicular LM RF: | No significant abnormalities |
| Navicular LM LF: | No significant abnormalities |
| Fetlock LM RF: | No significant abnormalities |
| Fetlock LM LF: | No significant abnormalities |
| Fetlock LM RH: | No significant abnormalities |
| Fetlock LM LH: | No significant abnormalities |
| Tarsus LM + APLO RH: | No significant abnormalities |
| Tarsus LM + APLO LH: | No significant abnormalities |
| Tarsus APLO RH: | No significant abnormalities |
| Tarsus APLO LH: | No significant abnormalities |
| Stifle LM RH: | No significant abnormalities |
| Stifle LM LH: | No significant abnormalities |
| Tarsus DP RH: | No significant abnormalities |
| Tarsus DP LH: | No significant abnormalities |
| Stifle DP RH: | No significant abnormalities |
| Stifle DP LH: | No significant abnormalities |
| Carpus RF: | No significant abnormalities |
| Carpus LF: | No significant abnormalities |
| Back: | mild narrowing of the spinous proces thoracal and lumbal |
| Neck: | No significant abnormalities |

**Ultrasound:**

Suspensory RF: No significant abnormalities
Suspensory LF: No significant abnormalities
Suspensory RH: No significant abnormalities
Suspensory LH: No significant abnormalities
Stiffle RH: Distention MFT joint (in normal limits, no lesions)
Stiffle LH: Distention MFT joint (innormal limits, no limits)

Other radiological examinations: no.

Other findings and remarks: no
During the examination there were no indications of vices.
After the examination blood samples were taken for investigation of banned substances.

<u>**Overview Conclusion**</u>

**Conclusion Clinical Examination**

No abnormal findings ☑

Abnormal findings (see examination protocol) ☐

Not perforrmed ☐

**Conclusion of the X-Ray Examination**

Good ☑

Satisfactory ☐

Moderate ☐

Unsatisfactory ☐

Not performed ☐

This report is only valid if provided with a signature and general terms and conditions.

---

**EMAIL:** seifertcharlotte@hotmail.com

**DIERENARTS CHARLOTTE SEIFERT**
Olmenlei 53, 2980 Zoersel, BELGIUM
T +32 (0)498 46 00 51

Acceptable                                              ☑

Increased Risk                                          ☐
Not Acceptable                                          ☐

**Final Conclusion:**

**The horse receives a normal medical risk as a sporthorse.**

There is no swellings on the legs and no sensitivity in muscle palpation, the horse gives a strong and healthy impression.

Kind regards,

This report is only valid if provided with a signature and general terms and conditions.

**EMAIL:** seifertcharlotte@hotmail.com



**DIERENARTS CHARLOTTE SEIFERT**
Olmenlei 53, 2980 Zoersel, BELGIUM
T +32 (0)498 46 00 51

**Terms and conditions**
*A prepurchase or sale examination gives only my personal assessment of the current medical condition of the horse. Linked is a type of risk assessment of medical problems that can happen regarding the use of the horse.*
This examination has several limitations:

- Each exam is a snapshot. Any horse can at one moment seem very healthy, or at another limping, showing heart murmurs or respiratory distress.This difference may be due to coincidence, occurred after injury or illness, changes in housing, whether or even drug camouflage prior to the exam.
- If the customer wants it, there is the possibility to include a blood sampling to detect illegal substances.
- It deals no obligation towards any results. The horse is examined in function of a client and the purpose for which the horse will be used. This exam and the standards used fort it, can therefore vary between clients and horses. This report is therefore only applicable to no one else than the person stated on the report.
- The client agrees with the extent of the investigation, and realizes that this is always a compromise between risk-limitation and price for the exam. If for example an additional endoscopy or additional X-rays are desirable, this can be asked in advance or during the exam.
- The standards used in the radiographic examination can be different from those used by colleagues or universities and can differ between what is common in different countries. There are only those findings indicated that I believe are important. Deviations that I believe have no interest are not mentioned. Example: fragments at the distal border of the navicular bone (with or without a recess in the navicular bone itself), ossification of the hoof cartilage, etc.
- Since this exam is no research addressing the capabilities of the horse as a riding or sporthorse... Neither is it a valuation of the horse.
- It cannot clearly demonstrate whether the horse might have had surgery or other treatments, such as repeated infiltration of the joints, colic surgery, ... Hence it is the sole responsibility of the purchaser to cover himself here.
- It is also the sole responsibility of the purchaser to cover himself in terms of stable vices such as: crib biting, wind sucking, weaving ...
- The buyer must be aware that some diseases are seasonal, so they may not be present at the time of the inspection. (for example summer itch, headshaking, ...) About this aspect he must cover himself as well.
- If the buyer wants to insure the horse, he will have to wait before buying it, until he has the approval of the insurance company. A test conducted by myself, is not automatically an approval for an insurance company. They may have different standards.
- This exam gives you no advise as a future stallion, because the standards used for this can be vary between the different studbooks.
- It is also the buyer's full responsibility to receive the full ownership papers included the "mutatie luik" of the horse.

This report is only valid if provided with a signature and general terms and conditions.

**EMAIL:** seifertcharlotte@hotmail.com

EXHIBIT 2

# Purchase Agreement

THIS PURCHASE AGREEMENT is made this 11th day of May, 2023, by and between 2166325 ONTARIO Inc Dba Equestrian International, authorized agent for ___Theo Boris/Desiree Johsnon___ (hereinafter referred to as "Seller") with an address of 5045 Orbitor Drive, Building 12, Suite 201, Mississauga, ON L4W4Y4 and MANE VENTURES LLC, (hereinafter referred to as "Buyer") with an address of 412 Piazza Lido, Newport Beach, California, USA 92663 (Buyer and Seller are sometimes collectively referred to as the "parties").The parties hereby acknowledge that this Purchase Agreement is made for the purchase and sale of the horse, described as follows in paragraph A below, on the following terms and conditions as set forth herein. NOW THEREFORE, for good and valuable consideration, receipt of which the parties hereby acknowledge, the parties AGREE AS FOLLOWS:

## A. Description of Horse:

Name: Quebec Z

UELN: 056015Z55565414        Chip: 528210004035313

Date of Birth:  April 10, 2014        Color: Bay

Breed: Zangersgsheide        Sex: Gelding

(hereinafter referred to as the "Horse").

**B. Consideration.** In consideration of the total sum of $87,500 USD ($87,500), Seller agrees to sell and Buyer agrees to buy the Horse on the terms and conditions further set forth herein.

**C. Payment Terms.** The Buyer shall tender the full amount of $87,500 by wire transfer before the buyer takes possession of Horse.

WIRING INFORMATION:
BANK OF AMERICA
100 West 33rd Street
New York, NY 10018
For Credit to the account of Cambridge Mercantile Corp (USA)
1350 Broadway, Suite 810
New York, NY 10018
Account #        6831
ABA #        593
Please Reference:  2166325 Ontario Inc dba Equestrian International

Page 1 of 3

**D. Acknowledgments.** The Buyer acknowledges and understands that (i) they are purchasing the horse in an "as-is" condition. Buyer has had the opportunity to obtain buyer's Inspection, Veterinarian's Certificate of Soundness and Insurability, Seller's Disclosures, and Disclaimer of Certain Warranties. The Buyer has inspected and/or ridden the horse and approves of its condition, temperament and ability as a hunter/jumper suitable for Buyer's intended purposes/uses. The Buyer has caused the horse to be examined by a licensed veterinarian acceptable to Buyer and has obtained from such veterinarian an opinion that the horse is healthy, free from infectious disease, is insurable for all risks of mortality, and is a suitable and acceptable horse for the Buyer. THERE IS NO WARRANTY OF MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE MADE BY SELLER IN CONNECTION WITH THE SALE OF THE HORSE SOLD HEREBY.

**E. Warranty of Title**. Seller represents and warrants to Buyer that Seller is the sole, lawful owner of the Horse and has the legal right to convey title of the Horse to Buyer.

**F. Conveyance.** Upon receipt of the Balance coupled with the execution of this Purchase Agreement, Seller conveys all right, title and interest in the Horse to Buyer free and clear of any and all liens and encumbrances. The Buyer agrees to pay any and all bills that are incurred after the date and time of the signing of this agreement.

**G. Taxes.** If any sales, use or other taxes are due as a result of this purchase and sale of the Horse, Buyer agrees to pay all such taxes and indemnify and hold Seller harmless from the same.

**H. Governing Law**. This Purchase Agreement shall be governed by the laws of the state of California exclusive of any conflicts of laws provisions. If any provision is found invalid or unenforceable, the remainder shall stay valid and enforceable at all times – now and in the future. It is also agreed that any legal disputes between Buyer and Seller arising out of this Purchase Agreement shall be brought and litigated in a provincial or federal court of proper jurisdiction located in or nearest to Orange County, California, USA; Buyer and Seller agree that this venue is convenient.

**I. Amendments/Modifications.** Modifications to this Purchase Agreement shall only be binding if they are in writing and signed by both the Seller and Buyer (an authorized member of the corporation or LLC).

**J. Entire Agreement.** This Purchase Agreement constitutes the entire agreement between the parties with respect to the subject matter herein and incorporates and integrates all previous negotiations, understandings, undertakings, and promises between them, either oral or written, with regard to the purchase of the Horse.

As the person signing below on behalf of the Seller, I hereby confirm that I am the lawful Owner of this Horse or the Owner's duly authorized agent or officer and I am authorized to convey legal title to the Horse pursuant to this Purchase Agreement. As the person signing below on behalf of the Buyer, I understand that any warranties or representations from the Seller or the Seller's agent that I am relying upon in acquiring this Horse, including warranties or representations with respect to the Horse's age, medical condition, prior medical treatments, and the existence of any liens or encumbrances, should be stated in writing as part of this Purchase Agreement.

SELLER:   2166325 ONTARIO Inc
          dba Equestrian International

By: *Beata Zbierowska*

Printed name: Beata Zbierowska
Email address: beata@equestrianinternational.horse
Date: 5/12/2023


BUYER: Mane Ventures LLC

By: *Diana Thomas*

Printed name: Diana Thomas
Email address: dianathomas2121@gmail.com
Date: 5/12/2023

By: *Amelia Thomas*

Printed name: Amelia Thomas
Email address: amelia.elyse.thomas@gmail.com
Date: 5/12/2023


AGENT: Valerie Downing

By: _____

Printed name: Valerie Downing
Email address: vdowning13@gmail.com
Date: 5/12/2023

EXHIBIT 3



ABJ Equine Practice
PO Box 1750
Rancho Santa Fe, CA, 92067

Ph 858-759-2772
Email abjoffice@abjequine.com

**CLINICAL SUMMARY**

| | |
|---|---|
| **Animal No.** | 110266 |
| **Attending Vet(s)** | Anne McCabe, DVM.,M.S. |
| **Printed At** | 07-15-2023 |
| **Printed By** | Anne McCabe, DVM.,M.S. |

## Clinical Summary for Queso

### 👤 Client Details

| **Name** | Thomas, Diana | **Phone** | 949- |
|---|---|---|---|
| **Address** | | | |

### 🐴 Patient Details

| **Name** | Queso | **Age** | 9 years |
|---|---|---|---|
| **Species** | Equine (Horse) | **Sex** | Gelding |
| **Breed** | Warmblood | | |

**Friday the 30th of June 2023**

---

**11:30AM**   🖥 Presenting Problem(s)

**System**

Exam--Lameness, flexions..... US LH SL, blocked out LH lameness, went sound in LH and lame in RH. US RH SL----same chronic Susp desmitis, irreg prox MT3 , branches involved as well (all 4)...

**10:15AM**   🐴 Diagnostic Request

**Requested By:** Anne McCabe, DVM.,M.S.
**Supplier:** Asteris
**Reference:** US1902-DR178
**Status:** Scheduled 06-30-2023 3:15:18am

Ultrasound Request

**09:37AM**   🖥 Physical Exam

**Anne McCabe, DVM.,M.S.**

Osuna Stock Farm, RSF, CA...... Hx: Newly purchased horse from Europe. Received & reviewed Prepurchase Exam (PPE) Report and Xrays. The PPE report was commendatory on this horse's physical/clinical condition, and concluded he was an acceptable risk for a future career as a sporthorse. Trainer reports that the horse has difficulty performing his tasks as a jumper and feels he has problems jumping fences.

Static Exam: Horse is sore thruout back from withers to sacrum, unyielding to rear limb flexions--leans heavily on operator and refuses to engage his sacrum in motion. The medial hock/suspensory origin area is firm and enlarged in LH more than RH and is painful to palpation. Front legs are more flexible, front Suspensory Ligaments react mildly to digital pressure. All 4 feet are normal: no reaction to HT's, normal DPs, decent conformation and shoeing. Neck is mildly reactive to palpation distally. Horse is bright & alert, a bit of a character to handle.

Dynamic Exam: Horse was examined on hard (HG) and soft ground (SG) . He was lame 2/5 in LH on SL, CR, and CL. He was noticeably more fractious under saddle when asked to make turns, worse on right turns (CR). Flexion tests : +2/5 LH--upper limb; negative to lower limb........+1/5 RH limb flexions.......+1/5 RF and LF limb flexions. Horse was



**ABJ Equine Practice**
PO Box 1750
Rancho Santa Fe, CA, 92067
Ph: 858-759-2772
Fax:
Email: abjoffice@abjequine.com

positive to Suspensory Ligament Squeeze Tests in both LH and RH SLs. Ultrasound Scans of both rear SLs were done followed by Nerve blocks.

📃 Physical Exam

**Anne McCabe, DVM.,M.S.**

in order to ascertain cause of LH persistent lameness.

LH Ultrasound: Shows Chronic Suspensory Desmitis throughout entire length. RH Ultrasound is similar to findings in LH ultrasound but of less magnitude. Chronic manifestations of Suspensory desmitis include: compressed soft tissue reactions in make-up of SL fibers such as fibrous tissues pervasive in mix with collagen fibers. peripheral fascia abundance, irritated bone structures, and loosened attachments of ligament to bone.

Once LH US was performed, deemed it necessary to block LH SL origin. Did RH US Scan while waiting for LH block to work.

LH Prox SL block>>>> sound in LH on SL, CR, CL.......moved much more forward and showed slight RH lameness....

---

**Friday the 23rd of June 2023**

---

07:57PM    📃 Presenting Problem(s)
           **Anne McCabe, DVM.,M.S.**

07:06PM    ⚙ Diagnostic Request
           **Requested By:** Anne McCabe, DVM.,M.S.
           **Supplier:** Pathogenes Inc
           **Reference:** US1902-DR145
           **Status:** None

           ⚙ Diagnostic Request
           **Requested By:** Anne McCabe, DVM.,M.S.
           **Supplier:** Zoetis Reference Labs
           **Reference:** US1902-DR144
           **Status:** None

06:55PM    📃 Physical Exam
           **Anne McCabe, DVM.,M.S.**

           Stock Farm RSF... New horse-BAR--healthy... Exam-Lameness. Horse was vetted in Europe. Need to review Xrays. Static Exam: "V"-shaped conformation from lateral aspect with legs and Back. Both hocks are large, thickened. LH SL is thickened and is larger than RH SL. Horse is very sore to palpation of T-L spine , especially in jct. Rear legs are very difficult to flex maximally, at rest and after warmup. Front SLs and limbs are OK. Both front SLs are mildly sore to palpation.



**ABJ Equine Practice**
PO Box 1750
Rancho Santa Fe, CA, 92067
Ph: 858-759-2772
Fax:
Email: abjoffice@abjequine.com

Dynamic: Horse is hard to lunge, noncooperative. He is lame in LH today, seems unable to make turns properly. Horse exhibits same problem turning under saddle, CL more than CR. Moves rear legs under himself excessively, worse with LH>>RH.

Suspect neurological issue. Run Equine Wellness Panel & EPM Panel-Pathogenes Lab.

⬟ Diagnostic Request
**Requested By:** Anne McCabe, DVM.,M.S.
**Supplier:** Zoetis Reference Labs
**Reference:** US1902-DR146
**Status:** None
Wellness Bundle, Large Animal

⬟ Diagnostic Request
**Requested By:** Anne McCabe, DVM.,M.S.
**Supplier:** Pathogenes Inc
**Reference:** US1902-DR147
**Status:** None
EPM Screening

---

**Thursday the 22nd of June 2023**

---

07:33AM    🗐 Presenting Problem(s)
         **Anne McCabe, DVM.,M.S.**

**Wednesday the 21st of June 2023**

---

07:57PM    🗐 Physical Exam
         **Anne McCabe, DVM.,M.S.**

12:00PM    🗐 Presenting Problem(s)
         **Anne McCabe, DVM.,M.S.**

         Exam-Lameness.. Wellness Panel, EPM Panel.. Lame LH, sore hocks & T-L Jct.

07:33AM    🗐 Physical Exam
         **Anne McCabe, DVM.,M.S.**

         Healthy horse. Recently imported from Europe. Needs soundness evaluation. Seems slightly neurological --stands in "V" shape from side with front & back legs..